IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA
TULSA DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | § | CIVIL NO. 18-CV-166-TCK-CDL |
| *ex rel.* Tesfalem Issac, | § | |
| | § | |
| Plaintiff, | § | |
| | § | RELATOR TESFALEM ISSAC'S |
| v. | § | FIFTH AMENDED COMPLAINT |
| | § | |
| LOCKHEED MARTIN, | § | |
| | § | |
| Defendant. | § | JURY TRIAL DEMANDED |

## **RELATOR TESFALEM ISSAC'S FIFTH AMENDED COMPLAINT**

## TABLE OF CONTENTS

I.     Introduction to Case ............................................................................................1

II.    Jurisdiction and Venue.......................................................................................6

III.   Introduction to Relator .....................................................................................7

      A.     Background on Relator Tesfalem Issac ..................................................7

      B.     Original Source and Disclosures............................................................7

IV.   Introduction to Defendant .................................................................................8

V.    Federal Acquisition Regulation ("FAR") ..........................................................8

      A.     Overview ................................................................................................8

      B.     Part 46 – Quality Control.......................................................................9

      C.     Part 52 – Allowability of Costs ...........................................................10

      D.     Department of Defense Test Method Standard ("The Standard") ........10

      E.     FAR Mandatory Disclosure Requirements ...........................................11

      F.     Notification of Potential Safety Issues (48 C.F.R. § 252.246-7003) .....12

      G.     Health and Safety on Government Installations
            (AFFARS 5352.223-9001) ...................................................................12

VI.   Health and Safety Regulations.........................................................................13

      A.     Occupational Safety and Health Act of 1970. .....................................13

      B.     2012 DoD Best Practices Manual Regarding Contractor Safety ..........16

VII.  Environmental Statutes and Regulations .........................................................17

      A.     Contract Provisions Concerning Environmental Health …………………...17

      B.     Clean Air Act …………………………………………………………18

            1.     Background …………………………………………………...18

            2.     Regulations Regarding Volatile Organic Compounds…………………...18

C.     FAR Provisions Related to Environmental Safety ……………………………...19

VIII.    Lockheed Martin's C-130J Super Hercules Project...........................................................20

    A.     Overview.................................................................................................................20

    B.     C-130J Contracts....................................................................................................22

    C.     Claim Submission and Payment ...........................................................................22

    D.     Overview: C-130J Integral Fuel Tanks.................................................................24

    E.     Manufacturing Process Standard: C-130J Integral Fuel Tanks ............................26

    F.     Lockheed Martin's Certifications Regarding the Manufacturing Process ...........29

IX.    Lockheed Martin's Detrimental Impact on the Environment and Employee Health ........29

X.    Lockheed Martin's Fraud on the Federal Government......................................................31

    A.     Relator's Discovery of Lockheed Martin's Fraud ………………………………31

    B.     Lockheed Subjected Employees to Hazardous Conditions for Profit …………...34

    C.     Lockheed Martin Concealed its Unsafe Working Conditions from OSHA .…….37

    D.     Lockheed Martin's Knowing and Reckless Disregard of the Manufacturing and Environmental Standards for Sealing Integral Fuel Tanks …………………38

    E.     Examples of Mechanical Problems Due to Improper Sealing of Fuel Tanks …...40

    F.     Lockheed's Shortcut Cheated the Government …………………………………40

XI.    Lockheed Martin Retaliated Against Relator ..................................................................42

XII.    Actionable Conduct ........................................................................................................48

    A.     False Claims Act ...................................................................................................48

        1.     Applicable Law.........................................................................................48

        2.     Defendant's Violations of the False Claims Act.......................................49

            a.     Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))..................................................................................49

        b.      Making or Using False Records or Statements Materials to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B)) ..............51

    B.      Defendant's Retaliation Against Relator ................................................53

XIII.    Causes of Action ..............................................................................................54

    A.      Count I – Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A)) ..............................................................................54

    B.      Count II – False Records or Statements (31 U.S.C. § 3729(a)(1)(B)) ..................55

    C.      Count III – Retaliation (31 U.S.C. § 3730(h)) ......................................57

XIV.    Demand for Jury Trial ......................................................................................58

XV.    Exhibit Index  ..................................................................................................58

Plaintiff/Relator Tesfalem Issac ("Issac" or "Relator") brings this action pursuant to the False Claims Act, 31 U.S.C. §§ 3729–3732, and seeks to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States of America and on his own behalf. Relator would respectfully show the following:

## I.   INTRODUCTION

1.      The Lockheed Martin C-130 family of aircraft is the United States military's principal tactical troop, cargo, and medevac transport aircraft and has been in service to the military for more than 60 years.  In 1997, Lockheed Martin developed the latest model of C-130 aircraft—the C-130J Super Hercules. The C-130J is an improved version of its predecessor aircraft and includes significant advances in avionics and performance.

2.      Because the C-130J was designed and developed without any financial or production assistance from the United States Government, Lockheed Martin owns all of the design and engineering data for the C-130J and will not provide that information to the Government. Therefore, the Government can only contract with Lockheed Martin for the construction and maintenance of the C-130J, and Lockheed Martin writes the primary technical and manufacturing standards for the aircraft.

3.      In 2006, the Department of Defense ("DoD") awarded Lockheed Martin its first contract for the delivery of C-130J aircraft, contract no. FA8504-06-D-0001 ("2006 contract"). The 2006 contract required Lockheed to refurbish and provide services for existing C-130Js, including, but not limited to, logistics support, program management support, engineering services, spares, and technical data in support of C-130J systems.

4.      The 2006 contract was set to expire in 2016; however, Lockheed Martin and the Government have modified and extended the contract on numerous occasions. The Government

1

also awarded Lockheed a contract to construct new C130J aircraft in 2011 ("2011 contract"), contract no. FA8625-11-C-6597, which also has been modified. Lockheed has continued to manufacture C-130J aircraft at its facility located at Dobbins Air Reserve Base in Marietta, Georgia.

5.      Pursuant to the 2006 and 2011 contracts, Lockheed Martin agreed to comply with the Federal Acquisition Regulation ("FAR"), which requires that the C-130J be manufactured in compliance with the terms of the contract and that Lockheed Martin implement a quality control system to prevent the delivery of defective aircraft to the Government. Relevant here, Lockheed Martin agreed to manufacture integral fuel tanks located in the wings of the C-130J in compliance with the Manufacturing Process Standard created by Lockheed Martin, which was incorporated into its contracts with the Government.

\* \* \*

6.      Relator Tesfalem Issac worked as a structural mechanic for Lockheed Martin for more than a decade.  In 2010, Relator was promoted and assigned to work on the team responsible for sealing the integral fuel tanks on the C-130J aircraft, as required by the 2006 and 2011 contracts. The process is designed to be slow, meticulous, and precise to ensure that the fuel tanks are sealed properly.

7.      According to Lockheed Martin's Manufacturing Process Standard for sealing fuel tanks, an adhesion promoter must be applied slowly and in small amounts with an aerosol can, paint brush, or cotton cloth until every part of the wing that will be sealed is covered. Then the sealant must be applied between 30 minutes to eight hours after applying the promoter.  If the adhesion promoter is applied incorrectly, the sealant will not adhere to the wing, and there is a

substantial risk that fuel will leak from the plane. Even worse, when a fuel tank leaks, a plane could have to make an emergency landing or the fuel tank could explode, causing the aircraft to crash.[1]

8.    Shortly after Relator began working on integral fuel tanks, Lockheed Martin decided to circumvent the careful manufacturing process specified in its contracts to increase its output of C-130Js. To that end, Relator's supervisor, David Crump, took paint spray guns from the aircraft paint shop and told Relator and his crew to use the guns to spray the adhesion promoter inside the wings where the fuel tanks are located.

9.    Relator and his coworkers became sick from the noxious fumes released when the promoter, PR-148, was applied with the paint spray guns, as they were spraying the chemical inside of the aircraft's wing where air circulation barely exists. PR-148 contains toluene, which is a highly toxic volatile organic compound (VOC) that is extremely harmful to human health and the environment. Employees were inhaling what amounts to industrial strength airplane glue every second that they worked on the wing.

10.    Worse still, Lockheed Martin failed to provide Relator and his coworkers with air-fed respirators and other protective gear in accordance with federal regulations. In violation of the OSHA Act, the terms of its contracts with the Government, and protocols required by the DoD, Lockheed Martin forced employees to work in hazardous conditions and failed to provide sufficient respirators and protective gear.

11.    Relator began asking Mr. Crump and other Lockheed personnel about the company's use of the paint spray gun method and practice of leaving adhesion promoter on the aircraft for more than eight hours, sometimes for days, without applying any sealant— both complete and total deviations from the Manufacturing Process Standard incorporated into the

_____

[1] For example, the crash of flight TWA-800 in July 1996 was caused by an electrical spark within an area of the plane that had filled with aviation fuel vapor.

contracts. Relator repeatedly told Mr. Crump and other personnel that he and other employees were getting sick from the high level of fumes produced by using a paint spray gun. Lockheed Martin did not change its practice, however, and management continued to require the mechanics to use paint spray guns.

12.     Frustrated by Lockheed Martin's continued use of the spray guns, Relator and other employees contacted OSHA directly in 2016 and complained that the spraying of the promotor was making employees sick. Relator was told that OSHA would conduct an air quality test.  Approximately two days before the OSHA test, Lockheed management took preemptive measures to ensure a successful outcome by changing the spray gun nozzle aperture to a larger size.  They also reduced the paint gun air pressure, causing the spray gun to become a high volume-low pressure (HVLP) apparatus.  The result of this change was a dramatic reduction in the atomization of PR-148 and toluene. Through a combination of aperture enlargement and lower air pressure, when the PR-148 was applied during the OSHA test, less toluene VOCs were available to impregnate the surrounding air. In other words, Lockheed concealed its environmentally unsafe practices for the purpose of misleading OSHA and manipulating the air quality results.

13.     The OSHA inspectors removed the sensor after the air quality testing, and a few days later, Lockheed management changed the spray gun nozzle apertures back to the original sizes, which used less of the promotor but aerosolized much more of the chemical in the work area, resulting in more of the product being ingested by the employees. They also increased the air pressure of the spray gun.

14.     Lockheed Martin has intentionally disregarded the manufacturing standards for sealing the integral fuel tanks for C-130J aircraft, and its conduct is in clear violation of the Federal Acquisition Regulation, health and environmental regulations, and the terms of its contracts with

the Government.  In fact, On July 17, 2018, DoD personnel inspected the Lockheed Martin facility

and caused the paint spray guns to be tagged as out of compliance with the Manufacturing Process

Standard for sealing C-130 integral fuel tanks:




*See* Exhibit 7 (Photographs of "stop work" tags, noting that use of paint spray guns was out of

compliance with the Manufacturing Process Standard for sealing C-130 integral fuel tanks); *see*

*also* Exhibit 1 (Manufacturing Process Standard).

15.    Lastly, Lockheed has cheated the Government by bidding the contract as if

promoter would be applied using one of three approved methods – aerosol can[2], soft bristle brush,

---

[2] **An aerosol can is** a dispenser that holds a substance under pressure and releases it as a fine spray. For example, some brands of hair spray are dispensed using an aerosol can. A paint spray gun, on the other hand, uses a larger nozzle and

or clean cloth. When promoter is applied properly, it can take around eighty (80) hours to complete each fuel cell. Spraying promoter on with a spray gun, however, only takes around an hour. Lockheed bid the contract and billed the Government as if the labor would require many more hours of labor per fuel cell than it actually took.

16.     Lockheed Martin's misconduct has clearly put at risk the lives of its employees and hundreds of thousands of people serving in the United States military, as well as caused damage to the environment. It has also grossly overcharged for labor, and the United States has suffered financial harm as a result.

## II.     JURISDICTION AND VENUE

17.     Jurisdiction and venue are proper in the Northern District of Georgia pursuant to the False Claims Act (31 U.S.C. §§ 3729–33), because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729, some of which occurred in the Northern District of Georgia. Defendant engages in business in the Northern District of Georgia and is subject to general and specific personal jurisdiction pursuant to 31 U.S.C. § 3732(a) in that the claims for relief in this action are brought on behalf of the United States for multiple violations of 31 U.S.C. § 3729.

18.     Lockheed manufactures the C-130J aircraft and performs the work required by the 2006 and 2011 DoD contracts at its facility located at Dobbins Air Reserve Base in Marietta, Georgia. Relator worked at Dobbins Air Reserve Base and performed work required by both contracts, and events giving rise to this case took place there. Accordingly, venue is proper in the Northern District of Georgia.

---

releases much more of the substance at once. *See, e.g.,* images 10 and 11 *supra* (paint spray guns used by Lockheed Martin employees).

### III.   INTRODUCTION TO RELATOR

**A.   Background on Relator Tesfalem Issac**

19.     Relator Tesfalem Issac has fourteen years of experience working as a structural mechanic for Lockheed Martin and more than a decade of experience working on the C-130J Super Hercules aircraft. Prior to July 2018, Mr. Issac worked on C-130J aircrafts as a tank sealer.[3] He is intimately familiar with the rules, requirements, and technical procedures for manufacturing C-130J aircraft.

20.     Lockheed forced Relator and his coworkers to work in a hazardous and unsafe environment, and Relator suffered multiple health problems as a result. Relator complained about the unsafe work conditions, but his complaints were never resolved, and his health continues to decline. Lockheed terminated him in November 2018 and told him, ironically, that it was because his health had worsened to the point that it claimed it could not place Relator in a suitable position. Relator's medical conditions were caused by Lockheed's use of an unsafe and prohibited manufacturing method, in violation of its contracts with the United States. Relator lost his health insurance when Lockheed terminated him, and he has been financially unable to seek treatment for his medical conditions, causing his health to worsen.

**B.   Original Source and Disclosures**

21.     There are no bars to recovery under 31 U.S.C. § 3730(e), or in the alternative, Relator is an original source as defined therein. Relator has direct and independent knowledge of the information on which his allegations are based. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and

---

[3] In July 2018, after filing this suit in March 2018, Relator was moved from the tank sealing area to a separate building. His job responsibilities devolved from skilled labor to menial tasks, such as fixing shelves, until Lockheed terminated his employment in November 2018 in retaliation for his repeated complaints about Lockheed's disregard of safety and the Manufacturing Process Standard.

materially adds to any publicly disclosed allegations or transactions and provided this information to the United States prior to filing a complaint by submitting a pre-filing disclosure statement on March 15, 2018. Relator has provided the United States with multiple supplemental disclosure statements since the filing of his Original Complaint.

22.    As required pursuant to 31 U.S.C. § 3730(b), Relator submitted an original disclosure statement to the Attorney General of the United States and the United States Attorney for the Northern District of Oklahoma contemporaneously with the service of his Original Complaint.

## IV.    INTRODUCTION TO DEFENDANT

23.    Defendant Lockheed Martin Corporation is a Maryland corporation with headquarters in Bethesda, Maryland. Lockheed is the world's largest defense contractor and specializes in global security, aerospace, and information technology.

## V.    FEDERAL ACQUISITION REGULATION

### A.    Overview

24.    The Federal Acquisition Regulation ("FAR") is a system of regulations jointly issued by the Department of Defense, the U.S. General Services Administration, and the National Aeronautics and Space Administration for use in acquiring goods and services in a uniform manner for Government contracts. FAR is codified in Title 48 of the United States Code of Federal Regulations.

25.    The Defense Federal Acquisition Regulation Supplement ("DFARS") and the Air Force Federal Acquisition Regulation Supplement ("AFFARS") are systems of regulations administered by the Department of Defense for the purpose of implementing and supplementing the FAR. They establish delegations of FAR authorities, deviations from FAR requirements, and DoD-wide policies and should be read in conjunction with the primary set of rules in FAR.

**B.      Part 46 – Quality Control**

26.      FAR places the ultimate burden of implementing a quality control system that ensures that products and services "acquired under Government contract conform to the contract's quality and quantity requirements" on the Government contractor. 48 C.F.R § 46.000. Compliance with contract requirements is a key part of the quality control process.

27.      Notably, FAR Part 46.105(a) explains that the Government contractor is responsible for carrying out its obligations under the contract by controlling the quality of the products or services provided and only providing to the Government products and services that conform to the contract requirements.  *See* 48 C.F.R. § 46.105(a).

28.      FAR's contract compliance and quality control requirements are compulsory, and the Government typically does not inspect the services and/or products that it acquires from contractors. Instead, the Government relies on the contractor to accomplish all inspection and testing needed to ensure that the products and/or services provided to the Government conform to the applicable contract. *See* 48 C.F.R. § 46.202-2(a). Indeed, when the Government acquires commercial items, such as aircraft, FAR expressly provides that "the Government shall rely on contractors' existing quality assurance systems as a substitute for Government inspection and testing before tender or acceptance unless customary market practices for the commercial item being acquired include any in-process inspection" by the Government. 48 C.F.R. § 46.202-1.

29.      Furthermore, when the contract at issue is a fixed-price contract—like the 2011 contract—the contract must include a provision expressly providing the minimum acceptable level of quality assurance. *See* 48 C.F.R. § 46.302.

**C.   Part 52 – Allowability of Costs**

30.   Federal procurement contracts may incorporate by reference the standardized contract provisions found in Part 52 of the FAR. Part 52 governs the costs and standards that apply to a contractor's invoice to the United States for charges associated with its performance. Section 52.216-7, in particular, requires the contractor to submit invoices to the Government subject to allowability of costs in accordance with Subpart 31.2. 48 C.F.R. § 52.216-7(a)(1). Under Subpart 31.201-2, a cost is allowable, in relevant part, only if it is (1) reasonable and (2) complies with the terms of the contract. 48 C.F.R. § 31.201-2(a). Payment by the United States may only be made upon the receipt of a proper invoice and satisfactory contract performance. *See* 48 C.F.R. § 32.905(a).

31.   Section 52.246 requires a contractor to have an inspection system that is acceptable to the Government and maintain inspection records. *See* 48 C.F.R. § 52.246-2(b). The Government must have access to the contractor's inspection records and may conduct inspections and tests during the manufacturing process. *See* 48 C.F.R. § 52.246-2(c). Additionally, the Government has the right to reject or require correction of nonconforming products. *See* 48 C.F.R. § 52.246-2(f). If the contractor fails to remove or correct the nonconforming products promptly, the Government has the right to remove or correct the products and charge the cost to the contractor or terminate the contract. *See* 48 C.F.R. § 52.246-2(h).

**D.   Department of Defense Test Method Standard ("The Standard")**

32.   In 1996, the Department of Defense (DoD) underscored the importance of FAR's quality control requirement by adopting MIL-STD-1916, also referred to as "the Standard." *See* exhibit 18 (DoD Test Method Standard, publication MIL-STD-1916). The Standard emphasizes the care that a defense contractor must exercise when supplying goods and services to the Government and the need for the contractor to implement efficient and effective quality control

10

and procedures to prevent defects.  The Standard also emphasizes that even if there are quality control systems in place, the system does not relieve the contractor from ensuring that the product and/or services provided to the Government comply with the applicable contract requirements. Relevant here, the Standard provides:

> 1.4 Product requirements. The contractor is required to submit product that meets all contract and specification requirements. ***The application of the quality plans or procedures of this standard does not relieve the contractor of responsibility for meeting all contract product requirements***. The contractor's quality system, including manufacturing processes and quality control measures, will be established and operated to consistently produce products that meet all requirements. Absence of any inspection or process control requirement in the contract ***does not relieve the contractor of responsibility for assuring that all products or supplies submitted to the Government for acceptance conform to all requirements of the contract.***

> 4.3 Disposition of nonconforming product. All units of product found to be nonconforming by the contractor shall be removed and kept apart from the flow of production or otherwise identified or segregated to preclude submission to the Government. The contractor may rework or repair these units unless the contract excludes such activities. Corrected product shall be screened by the contractor and resubmitted to the Government apart from the regular flow of the product.

Department of Defense, *Dep't of Defense Test Method Standard: DOD Preferred Methods for Acceptance of Product, MIL-STD-1916* (1996) (emphasis added).[4]

### E.     FAR Mandatory Disclosure Requirements

33.     FAR requires Government contractors to disclose when there is evidence that regulations have been violated. *See* 48 C.F.R. §52.203-13. To be effective, the disclosure must specifically state that it is being made in accordance with FAR's mandatory disclosure provisions and that the contractor has credible evidence that an offense has occurred subject to the mandatory disclosure provisions. *Id.*  Also, the disclosure must occur before an investigation and within thirty

---

[4] Available at http://www.variation.com/files/standards/milstd1916.pdf.

days of the putative violation in order to take advantage of the provision in the FCA that rewards timely self-disclosures with a limit of double rather than treble damages.

**F.     Notification of Potential Safety Issues (48 C.F.R. § 252.246-7003)**

34.     Contractors must provide notification of "all nonconformances or deficiencies that may result in a safety impact for systems, or subsystems, assemblies, subassemblies, or parts integral to a system, acquired by or serviced for the Government." *See* 48 C.F.R. § 252.246-7003. Specifically, contractors must "notify the Administrative Contracting Officer (ACO) and the Procuring Contracting Officer (PCO) as soon as practicable, but not later than 72 hours, after discovering or acquiring credible information concerning nonconformances and deficiencies" and should "provide a written notification to the ACO and the PCO within 5 working days that includes (i) A summary of the defect or nonconformance; (ii) A chronology of pertinent events; (iii) The identification of potentially affected items to the extent known at the time of notification; (iv) A point of contact to coordinate problem analysis and resolution; and (v) Any other relevant information." *Id.*

**G.     Health and Safety on Government Installations (AFFARS 5352.223-9001)**

35.     The following clause must be inserted in Air Force solicitations and contracts:

(a) In performing work under this contract on a Government installation, the contractor shall:

   (1) Take all reasonable steps and precautions to prevent accidents and preserve the health and safety of contractor and Government personnel performing or in any way coming in contact with the performance of this contract; and

   (2) Take such additional immediate precautions as the contracting officer may reasonably require for health and safety purposes.

(b) The contracting officer may, by written order, direct Air Force Occupational Safety and Health (AFOSH) Standards and/or health/safety standards as may be required in the performance of this contract and any adjustments resulting

from such direction will be in accordance with the Changes clause of this contract.

(c) Any violation of these health and safety rules and requirements, unless promptly corrected as directed by the contracting officer, shall be grounds for termination of this contract in accordance with the Default clause of this contract.

*See* AFFARS § 5352.223-9001.

## VI.    HEALTH AND SAFETY REGULATIONS

36.    Most DoD contracts include an OSHA compliance provision, which requires the contractor to certify that it will adhere to all OSHA health and safety regulations in the performance of the contract. Specifically, DoD contractors must adhere to the provisions of the Occupational Safety and Health Act of 1970 ("OSHA Act"), which require the employer to assume responsibility for its employees' safety and health and perform in accordance with an applicable accident prevention program pursuant to state and federal requirements. *See* 29 U.S.C. § 654(a).

37.    Requirements regarding the relationship between the Government and its contractors are also set forth in multiple regulations, reports, DoD contracts, and DoD manuals, including the sources discussed in this section.

## A.    Occupational Safety and Health Act of 1970

38.    Under the OSHA Act, all employers must comply with OSHA standards and must exercise reasonable diligence to determine whether violations of those standards exist. *See* 29 U.S.C. § 654(a).

39.    The OSHA Act makes clear that "employers have a duty under the law to train employees regarding work hazards and to furnish employees with suitable protection from such dangers." 29 U.S.C. § 654(a). A contractor also must ensure that its personnel are provided proper

13

OSHA training, safety equipment, and physical examinations under the OSHA "general duty" clause. *See* 29 U.S.C. § 654(a)(1) and  652(5).

40.     Contractors must provide a respirator to an employee when such equipment is necessary to protect the employee's health. *See* 29 C.F.R. 1910.134(a)(2). Employers are also required "to develop and implement a written respiratory protection program with required worksite-specific procedures and elements for required respirator use" and the "program must be administered by a suitably trained program administrator." 29 C.F.R. § 1910.134(c).

41.     Employers are responsible "for requiring the wearing of appropriate personal protective equipment in all operations where there is an exposure to hazardous conditions or where this part indicates the need for using such equipment to reduce the hazards to the employees." 29 C.F.R. § 1926.28(a). In confined spaces, tanks, or compartments, airline (or supplied-air) respirators must be used during spraying operations with paints mixed with toxic vehicles or solvents. *See* 29 C.F.R. § 1915.35(a).

42.     Respirators are also required, along with mechanical ventilation, regardless of whether the work area is large and well-ventilated. *See* 29 C.F.R. § 1915.35(a)(1)(i)-(iii) and (b)(1)). Filter respirators are required during brush applications of paints with toxic solvents in confined spaces or in other areas where there is limited ventilation. *See* 29 C.F.R. § 1915.35(a)(2). Workers entering such compartments for a limited time must also be protected by filter respirators. *See* 29 C.F.R. § 1915.35(b)(13). Either natural ventilation or mechanical exhaust ventilation should be used to remove the vapor at the source and to dilute the concentration of vapors in the working space to a concentration which is safe for the entire work period. *See* 29 C.F.R. § 1915.32(a)(2).

43.     Moreover, pursuant to the OSHA Act:

"Any standard promulgated under this subsection shall prescribe the use of labels or other appropriate forms of warning as are necessary to **insure that employees are apprised of all hazards to which they are exposed, relevant symptoms and appropriate emergency treatment, and proper conditions and precautions of safe use or exposure**. Where appropriate, such standard shall also prescribe **suitable protective equipment and control or technological procedures to be used in connection with such hazards and shall provide for monitoring or measuring employee exposure at such locations and intervals, and in such manner as may be necessary for the protection of employees.** In addition, where appropriate, any such standard shall prescribe the type and frequency of **medical examinations or other tests** which shall be made available, by the employer or at his cost, to employees exposed to such hazards in order to most effectively determine whether the health of such employees is adversely affected by such exposure."

29 U.S.C. § 655(b)(7) (emphasis added).

44.     The OSHA Act contains multiple regulations specifying the safety precautions contractors must take when doing business with the Government. For example, contractors must properly ventilate areas in which employees are using spray products that emit dangerous fumes. *See* 29 C.F.R. § 1910.107(d). Employers must also provide sufficient air circulation by supplying "clean fresh air, free of contamination from adjacent industrial exhaust systems, chimneys, stacks, or vents … to a spray booth or room in quantities equal to the volume of air exhausted through the spray booth." *See* 29 C.F.R. § 1910.94(c)(7)(i).

45.     Furthermore, the OSHA Act requires contractors to comply with the safety and health standards set forth in 41 C.F.R., parts 50-204, including any matters incorporated by reference therein. *See* 29 C.F.R. § 1925.2. Pursuant to 41 C.F.R. § 50-204.50(a)(1), "[e]xposures by inhalation, ingestion, skin absorption, or contact to any material or substance (i) at a concentration above those specified in the 'Threshold Limit Values of Airborne Contaminants for 1968' of the American Conference of Governmental Industrial Hygienists, except for the ANSI Standards listed in Table I of this section and except for the values of mineral dusts listed in Table

II of this section, and (ii) concentrations above those specified in Tables I and II of this section, shall be avoided, or protective equipment shall be provided and used."

**B.      2012 DoD Best Practices Manual Regarding Contractor Safety**

46.      The 2012 DoD Best Practices manual for optimizing contractor safety clarifies and discusses health and safety regulations pertaining to contracts with the Government. *See* U.S. Dep't of Def., Best Practices for Optimizing DoD Contractor Safety and Occupational Health Program Performance: A Guide for Contracting, Legal and Safety and Occupational Health Professionals 19. DoD Version 1.0. (2012). For example, the manual states:

> **"The contractor is responsible for an employee's safety and health and shall comply with OSHA regulations and perform in accordance with an applicable accident prevention program that complies with State and Federal requirements**. The contractor should have a safety board posted in a common area that provides points of contact for safety and health issues as well as Federal posters required by OSHA. **Applicable regulations include 29 C.F.R. Part 1910, Occupational Safety and Health Standards, 29 C.F.R. Part 1925, Safety and Health Standards for Federal Service Contracts.** The contractor should assess the workplace to determine if hazards are present, or are likely to be present, which necessitate the use of personal protective equipment (PPE).
>
> The contractor should verify that the required workplace hazard assessment has been performed through a written certification that identifies the workplace evaluated; the person certifying that the evaluation has been performed; the date(s) of the hazard assessment; and, identifies the document as a certification of hazard assessment."

*Id.* at 4-5. (emphasis added).

47.      The manual further elaborates on a contractor's safety and occupational health (SOH) responsibilities to its employees, which include ensuring "compliance with all applicable Federal, state and local codes and standards, including SOH standards, as well as any additional specific requirements invoked by contract." *Id.* at 9.

16

48.     With regard to United States Air Force service and commercial contracts, DoD's manual states that the contracting officer should include AFFARS Clause 5352.223-9001 if applicable, and if it is not applicable, the contracting officer must ensure that adequate health and safety requirements are identified in the Performance Work Statement (PWS). *Id.* at 24.

## VII.    ENVIRONMENTAL STATUTES AND REGULATIONS

### A.     Contract Provisions Concerning Environmental Health

49.     The Air Force expects contractors to "comply with all federal, state, and local environmental laws and regulations (or in overseas areas, with the laws and regulations of the particular country and requirements of any Status of Forces Agreements [SOFAs], treaties, etc., that may apply) in the same way as their Air Force customer." *Fact Sheet: Environmental Issues in Contracting*, PRO-ACT (May 1999), https://p2infohouse.org/ref/07/06050.htm.

50.     The Air Force environmental program adheres to the Environmental Management System (EMS) framework and its Plan, Do, Check, Act cycle for ensuring mission success. The following provide guidance on how environmental programs should be established, implemented, and maintained to operate under the EMS framework: Executive Order (EO) 13693, *Planning for Federal Sustainability in the Next Decade*, U.S. Department of Defense Instruction (DoDI) 4715.17, *Environmental Management Systems,* AFI 32-7001, *Environmental Management*, and international standard, ISO 14001:2004.

51.     Principally every Air Force contract will contain a provision that all contractors performing work on said contract must adhere to the Clean Air Act, 42 U.S.C. §§ 7401 et seq., and other environmental regulations.

B.    **Clean Air Act**

   1.    **Background**

   52.    The Clean Air Act (CAA) is the comprehensive federal law that regulates air emissions from stationary and mobile sources. *See* 42 U.S.C. §§ 7401 et seq. Among other things, this law authorizes the EPA to establish National Ambient Air Quality Standards (NAAQS) to protect public health and public welfare and to regulate emissions of hazardous air pollutants. *Summary of the Clean Air Act*, EPA, https://www.epa.gov/laws-regulations/summary-clean-air-act (last updated Aug. 6, 2020).

   53.    "The Clean Air Act (CAA) requires the EPA to regulate emissions of toxic air pollutants from a published list of industrial sources referred to as 'source categories.' Toxic air pollutants include mercury, polychlorinated biphenyls (PCBs), benzene and volatile organic compounds (VOCs)." *Regulatory   Information   by   Topic:   Air*,   EPA, https://www.epa.gov/regulatory-information-topic/regulatory-information-topic-air, (last updated Jan. 28, 2021).

   2.    **Regulations Regarding Volatile Organic Compounds**

   54.    The EPA classifies toluene, which is contained within the adhesion promoter utilized by Lockheed Martin, PR-148, as a volatile organic compound (VOC). VOCs are defined as any compound of carbon, excluding carbon monoxide, carbon dioxide, carbonic acid, metallic carbides or carbonates and ammonium carbonate, which participates in atmospheric photochemical reactions, except those designated by EPA as having negligible photochemical reactivity. 40 C.F.R. § 51.100.

   55.    VOCs are "compounds that have a high vapor pressure and low water solubility. Many VOCs are human-made chemicals that are used and produced in the manufacture of paints,

pharmaceuticals, and refrigerants. VOCs typically are industrial solvents, such as trichloroethylene; fuel oxygenates, such as methyl tert-butyl ether (MTBE); or by-products produced by chlorination in water treatment, such as chloroform. VOCs are often components of petroleum fuels, hydraulic fluids, paint thinners, and dry-cleaning agents. VOCs are common ground-water contaminants." *What are volatile organic compounds*, EPA, https://www.epa.gov/indoor-air-quality-iaq/what-are-volatile-organic-compounds-vocs (last updated Aug. 1, 2019).

56.     "Examples of toxic air pollutants include benzene, perchloroethylene, and methylene chloride. Examples of other listed air toxics include dioxin, asbestos, **toluene**, and metals such as cadmium, mercury, chromium, and lead compounds." *What are Hazardous Air Pollutants*, EPA, https://www.epa.gov/haps/what-are-hazardous-air-pollutants (last updated Feb. 9, 2017) (emphasis added).

57.     "Emissions of VOCs to the outdoors are regulated by EPA mostly to prevent the formation of ozone, a constituent of photochemical smog." *Technical Overview of Volatile Organic Compounds*, EPA, https://www.epa.gov/indoor-air-quality-iaq/technical-overview-volatile-organic-compounds, (last updated Apr. 12, 2017).

## C.     FAR Provisions Related to Environmental Safety

58.     Air Force contracts typically require compliance with multiple FAR provisions related to environmental safety. For example, FAR 52.223-13 requires contractors to certify the following: "As the owner or operator of facilities that will be used in the performance of this contract that are subject to the filing and reporting requirements described in section 313 of the Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA) (42 U.S.C. 11023) and section 6607 of the Pollution Prevention Act of 1990 (PPA) (42 U.S.C. 13106), the offeror

will file and continue to file for such facilities for the life of the contract the Toxic Chemical Release Inventory Form (Form R) as described in sections 313(a) and (g) of EPCRA and section 6607 of PPA." 48 C.F.R. § 52.223-13(b).

59.    Furthermore, FAR 52.223-19 requires contracting officers to insert the following clause into contracts for contractor operation of Government-owned or leased facilities located in the United States: "The Contractor's work under this contract shall conform with all operational controls identified in the applicable agency or facility Environmental Management Systems and provide monitoring and measurement information necessary for the Government to address environmental performance relative to the goals of the Environmental Management Systems." 48 C.F.R. § 52.223-19.

## VIII.   LOCKHEED MARTIN'S C-130J SUPER HERCULES PROJECT

**A.    Overview**

60.    The Lockheed Martin C-130, pictured below, has been in production since 1954 and is the United States military's principal method of transporting troops and equipment into hostile areas:



**Image 1: C-130, also referred to as the "C-130 Hercules."**[5]

61.    Referred to as the "Super Hercules," the C-130J is the latest model of the C-130 family of aircraft and entered production in 1997. The C-130J is the first major combat weapons

---

[5] https://fas.org/sgp/crs/weapons/R43618.pdf

system platform commercially procured by the DoD. Visually, the C-130J resembles the C-130; however, the C-130J includes significant advances in avionics and performance. Notably, the aircraft was built to enhance range, cruise ceiling time to climb, and speed and airfield requirements, as well as improve the speed at which the aircraft can be refueled.  The C-130J first entered active service with the United States Air Force in April 2004 and was first deployed in December 2004.



**Image 2: C-130J Super Hercules design enhancements.**[6]

62.     All design and engineering data for the C-130J systems, parts, and components are proprietary to Lockheed Martin. The Government requested that Lockheed Martin provide it with the information necessary to maintain the C-130J, but Lockheed Martin declined the request.  As a result, the Government can only contract with Lockheed Martin for the construction and maintenance of the C-130J, and the primary technical and manufacturing standards for the C-130J aircraft are drafted by Lockheed Martin.

---

[6] https://www.lockheedmartin.com/us/products/c130.html.

### B.    C-130J Contracts

63.    In 2006, Lockheed was awarded a $31,597,328 delivery order for C-130Js by the DoD pursuant to contract no. FA8504-06-D-0001. The 2006 contract required Lockheed to refurbish and provide services for existing C-130Js, including, but not limited to, logistics support, program management support, engineering services, spares, and technical data in support of C-130J systems. The contract is a sole source, cost plus/fixed fee contract with a period of performance beginning on October 13, 2006.

64.    The work for the contract at issue is conducted at Dobbins Air Reserve Base in Marietta, Georgia. The program manager for contract no. FA8504-06-D-0001 is Robert Lasseigne, and the contracting officer for the C-130J procurement is LaToya Brown. The quality assurance specialist is Anthony Paul Daigle.

65.    The original C-130J project was expected to be completed in 2016; however, the contract has been modified multiple times—contract nos. FA8504-16-D-0001 ($71,383,146.00) and FA8504-17-F-0047 ($74,695,578)—and Lockheed has continued its work on the C-130J.

66.    The 2011 contracts for the construction of new C-130J aircraft are contract nos. FA8625-11-C-6597, FA8625-14-C-6450, and FA8625-16-D-6458. The follow-on contracts are firm fixed price contracts, and the total amount of funds allocated by the Government for these contracts exceeds $1,000,000,000.

### C.    Claim Submission and Payment

67.    The 2006 contract is a sole-source/cost-plus contract. Under cost-plus contracts, DoD contractors bill the Government on a regular schedule (usually every two weeks) for all costs incurred during that period.  Specifically, FAR 52.216-7, Allowable Cost and Payment, states, "[t]he Government will make payments to the Contractor when requested as work progresses, but (except for small business concerns) not more often than once every 2 weeks, in amounts

determined to be allowable by the Contracting Officer in accordance with Federal Acquisition Regulation (FAR)." Invoices are submitted in the form of a public voucher via the Wide Area Workflow ("WAWF") system.[7]

68.     Vouchers submitted to the Government include the following express certification: "I certify that all payments requested for the appropriate purposes and in accordance with the agreements set forth in the contract." Contractors submit invoices via electronic means about every two weeks, and this certification appears on every electronic submission, not via some automatic population process, but because it was written in. This express certification may form the basis for falsity. *See, e.g., U.S. ex rel. Howard v. Lockheed Martin Corp.*, 14 F. Supp. 3d 982, 988 (S.D. Ohio 2014) ("Vouchers for payment which Lockheed submitted to the Government contained a certification that the costs were applicable, allocable, and reasonable, a standard consistent with FAR 31").

69.     The 2011 contract is a firm fixed-price contract. Under fixed-price contracts, DoD contractors bill the Government via WAWF on a schedule agreed to by the Contracting Officer via the progress payment method. *See* FAR 52.232-16, Progress Payments, which states that the "Government will make progress payments to the Contractor when requested as work progresses, but not more frequently than monthly." Progress payments are interim payments made based upon completion of certain work goals (milestones) or the expenditure of funds (expenses). *See* 48 C.F.R. § 52.232-16.

70.     The United States has paid Lockheed roughly $325 million on the 2006 contract and approximately $640.1 million dollars on contract FA8625-11-C-6597 to date.

---

[7] The WAWF system is a secure, web-based system for electronic invoicing, receipt, and acceptance. WAWF allows Government vendors to electronically submit and track invoices and receipt/acceptance documents and allows government personnel to process those invoices in a real-time, paperless environment.

**D.      Overview: C-130J Integral Fuel Tanks**

71.      Sealing fuel cells involves a three-step process: 1) cleaning the fuel cell; 2) applying an adhesion promotor necessary to ensure an adequate bond with the sealant; and 3) applying the sealant to the fuel cell. The contracts further require that the adhesion promoter be applied in one of three ways: 1) aerosol can; 2) soft bristle brush; or 3) clean cloth.

72.      Aircraft typically use three types of fuel tanks: integral, rigid removable, and bladder.  The fuel storage systems for large transport aircraft—like the C-130J—use all three types of fuel tanks.   The rigid removable (typically made of metal) and bladder (typically made of rubber) fuel tanks are detachable and can be installed and removed from an aircraft.

    

**Image 3: Example of Rigid Removable Fuel Tank        Image 4: Example of Bladder Fuel Tank**

73.      The integral fuel tanks, unlike the rigid removable and bladder tanks, are not detachable, because they are built directly into the C-130J during the manufacturing process. To build the integral fuel tanks, compartments are formed within the wings of the aircraft. The compartments (three in each wing) are separated by internal diaphragms. Then, to ensure that the fuel tanks do not leak, the fuel tank compartments are sealed, particularly the diaphragms, wing "skins," and skin joints that form the tank:



**Image 5: Wing of C-130J with Compartments for Integral Fuel Tanks**

74.     The integral fuel tanks are part of the wings and cannot be detached for service or inspection. Thus, the process used to manufacture the six tanks must be precise and in conformance with the contract.



**Image 6: Completed C-130J and Six Integral Fuel Tanks Inside Wings (red, yellow, and green)**

25

**E.      Manufacturing Process Standard: C-130J Integral Fuel Tanks**

75.      Lockheed's contracts with the Department of Defense require that C-130Js are manufactured in accordance with the Statement of Work contained in the contracts.  The Statement of Work, in turn, requires Lockheed to manufacture the C-130J in accordance with the Prime Item Development Specification ("PIDS") for the aircraft. Relevant here, the PIDS for the sealing of C-130J integral fuel tanks is contained in the "Lockheed Martin Aeronautics Company Manufacturing Process Standard," which was drafted by Lockheed Martin. *See* Exhibit 1 at 30 (Lockheed Martin Aeronautics Company Manufacturing Process Standard Sealing C-130 Integral Fuel tanks).

76.      According to the Manufacturing Process Standard incorporated into the contracts, there is a three-part process for sealing the integral fuel tanks of a C-130J. *First*, the interior of the tank must be cleaned.  The tank is vacuumed to remove "all dirt, chips, and other foreign material" and spray cleaned with aqueous cleaner, a type of cleaner that uses water as its primary solvent as opposed to chemicals. *Id.* at 30.  The tank is then dried with 100% cotton cleaning rags. The process is repeated until all surfaces of the tank are free of contamination.  *Id.* at 31.

77.      *Second*, adhesion promoter is applied to a small section of the fuel tank. The application of the adhesion promoter is integral to the sealing process.  If the promoter is applied incorrectly, the integral fuel tank will not be sealed properly, and fuel will leak from the wings of the aircraft. The adhesion promoter used by Lockheed Martin is PR-148, which is manufactured by PPG Aerospace:



**Image 7: PPG Aerospace PR-148 adhesion promoter used at Lockheed Martin facilities**

The promoter is blue, which serves as a "color code," to ensure that the promoter has been applied only to surfaces that will be sealed. *Id.* at 31-32. There are three methods by which adhesion promoter may be applied: aerosol spray can, soft bristle brush using a pint-size bottle, and a clean cloth saturated with adhesion promoter.

78.     ***Third***, after the promoter is applied to a small section of the fuel tank, it must then be exposed to air for at least thirty (30) minutes, but no longer than eight (8) hours, before sealant can be applied to the small section of fuel tank covered with the adhesion promoter. *Id.* at 32. When sealant cannot be applied within eight hours of the application of adhesion promoter, the fuel tank must be isolated within a confined space or covered with clean Kraft paper that is taped down with masking tape.



**Image 8: Kraft paper**

If the section of the fuel tank with the adhesion promoter is not properly protected, the promoter must be removed, the section of tank re-cleaned, and the process for applying the promoter restarted. *Id.* at 34.

79.     Notably, the eight-hour time limit for applying sealant after the application of adhesion promoter is required not only by Lockheed Martin's Manufacturing Process Standard but also the PPG Aerospace Technical Data. Exhibit 2 at 1 (Technical Data for PR-148 Adhesion Promoter).

80.     ***Fourth***, once the tank is properly cleaned and the adhesion promoter correctly applied to the section of fuel tank, the sealant is applied. Whether the sealant adheres to the tank and effectively prevents fuel leakage depends largely on whether the adhesion promoter was properly applied to the fuel tank. Sealing the fuel tanks on the aircraft is one of the most time-consuming parts of manufacturing a C-130J.



**Image 9: C-130J being maneuvered into an aircraft hangar by the
U.S. Air Force at Kandahar Airfield, Afghanistan.**

**F.      Lockheed Martin's Certifications regarding the Manufacturing Process**

81.      Lockheed Martin's contract and the FAR require that the aircraft be manufactured according to the manufacturing standards specified in the contract, which include the Manufacturing Process Standard for sealing C-130J integral fuel tanks.  Furthermore, contracts with the Government require contractors to comply with environmental regulations and the OSHA Act, which requires employers to minimize hazards and provide sufficient protective gear to employees.

82.      When Lockheed Martin delivers a completed C-130J to the Government, it certifies that the aircraft was manufactured in compliance with FAR, the OSHA Act, the Clean Air Act, and environmental regulations, as well as all contract requirements and specifications, including, but not limited to, the standards for sealing C-130J integral fuel tanks.

## IX.      LOCKHEED MARTIN'S DETRIMENTAL IMPACT ON THE ENVIRONMENT AND EMPLOYEE HEALTH

83.      As detailed in the following section, Lockheed put the health of the environment and its employees at risk by instructing employees to utilize a paint spray gun when applying PR-148. This method caused increased and unsafe emissions of toluene, an incredibly toxic substance.

84.      Toluene evaporates when exposed to air and quickly reacts with other chemicals. It has acute and chronic toxicity on aquatic life. Toluene has also caused membrane damage to the leaves in plants. *Toluene (methylbenzene)*, NAT'L POLLUTANT INVENTORY, http://www.npi.gov.au/resource/toluene-methylbenzene, (last updated Mar. 1, 2019).

85.      "Exposure to toluene may occur from breathing ambient or indoor air affected by such sources. The central nervous system (CNS) is the primary target organ for toluene toxicity in both humans and animals for acute (short-term) and chronic (long-term) exposures. CNS dysfunction and narcosis have been frequently observed in humans acutely exposed to elevated

airborne levels of toluene; symptoms include fatigue, sleepiness, headaches, and nausea. CNS depression has been reported to occur in chronic abusers exposed to high levels of toluene. Chronic inhalation exposure of humans to toluene also causes irritation of the upper respiratory tract and eyes, sore throat, dizziness, and headache." *Toluene*, EPA, Apr. 1992, at 1, https://www.epa.gov/sites/production/files/2016-09/documents/toluene.pdf.

86.   Symptoms of toluene overexposure also include ataxia, tremors, cerebral atrophy, nystagmus (involuntary eye movements), and impaired speech, hearing, and vision. Neurobehavioral effects have been observed in occupationally exposed workers. *Toluene*, EPA, July 2012, at 2-3, https://www.epa.gov/sites/production/files/2016-09/documents/toluene.pdf.

87.   "OSHA's exposure limits for toluene have been set to prevent effects of long-term exposure on the nervous system, however, workers frequently experience symptoms of toluene exposure in activities where exposures are lower than OSHA's present exposure limits." *Toluene*, OSHA, https://www.osha.gov/toluene, (last visited Apr. 12, 2021).

88.   For businesses categorized as "general industry," the exposure limit for toluene is 200 ppm TWA[8]. *See* 29 CFR 1910.1000 Table Z-2. Also, exposures shall not exceed 300 ppm (ceiling) with the following exception: exposures may exceed 300 ppm, but not more than 500 ppm (peak), for a single time period up to 10 minutes for any 8-hour shift. *Id.*

89.   As detailed in the following section, Lockheed exposed its workers and the environment to increased levels of toluene as a result of having employees use a paint spray gun to apply adhesion promoter.

---

[8] The time weighted average (TWA) for chemical exposure is the average exposure to a contaminant to which workers may be exposed without adverse effect during a typical workday.

## X.     LOCKHEED MARTIN'S FRAUD ON THE FEDERAL GOVERNMENT

### A.     Relator's Discovery of Lockheed Martin's Fraud

90.     Relator began working at Lockheed Martin as a structural mechanic in March 2004, and he was assigned to the department that manufactures Lockheed Martin F-22 Raptor tactical fighter aircraft. *See* Exhibit 3 at 3 (Relator's Official Lockheed Martin Job History & Employee ID Card). After the production of F-22s slowed in November 2005, Relator was transferred and assigned to work on the Lockheed Martin C-5 Galaxy, a large military transport aircraft. *Id.* at 4.

91.     In September 2006, Relator was transferred to work on Lockheed Martin's C-130J Super Hercules aircraft.  He was promoted to senior structural mechanic and assigned to work on the cockpit forward fuselage section of the aircraft.  Relator was laid off in February 2007 because of an economic downturn, but he was rehired in April 2008 to work again on the forward fuselage section of the C-130J.  On March 27, 2010, Relator was promoted again and assigned to work on the team that seals C-130J integral fuel tanks.

92.     Soon after Relator was assigned to work on the C-130J, Lockheed Martin decided to increase its output of the aircraft. Relator's supervisor, David Crump, took paint spray guns from the aircraft paint shop—a BINKS Model 60-600 SG-2 PLUS and a BINKS Model 80-600 SG-2 PLUS (Exhibit 4, specifications for the BINKS 80-600)—and told Relator and his crew to use the paint spray guns to apply adhesion promoter to the integral fuel tanks.



**Image 10: BINKS Model 60-600 SG-2 PLUS used to apply adhesion promoter at Lockheed Martin facilities**



**Image 11: BINKS Model 80-600 SG-2 PLUS used to apply adhesion promoter at Lockheed Martin facilities**

93.     The paint spray gun was a much faster, but much more dangerous, method of applying promoter. To seal the tanks, mechanics must climb a step ladder to reach inside the wings of the aircraft. The crew members then use the paint spray guns to apply the adhesion promoter on every section of the fuel tanks that will require sealant.



**Image 12: C-130J wing at Lockheed Martin facilities during fuel tank sealing process**

94.     The crew members use the paint spray gun in a confined area (the interior of the

wings) and, thus, are exposed to extremely toxic chemicals. *See* Exhibit 5 (Safety Data Sheet for

PR-148 Adhesion Promoter). The Safety Data Sheet (SDS) for the promoter states that it should

*not* be used indoors, much less in a confined space like an airplane wing. *Id.* at 2. The SDS further

states, "IF INHALED: Remove victim to fresh air and keep in rest position comfortable for

breathing." *Id.* (emphasis in original). Moreover, repeated exposure to the promoter may cause

permanent injury to bodily organs. *Id.* at 11.

**B.      Lockheed Subjected Employees to Hazardous Conditions for Profit**

95.      Shortly after Lockheed Martin implemented the paint spray gun method, Relator and several of his crew became sick from the fumes caused by the release of significant amounts of adhesion promoter into the air by the paint spray guns.  In violation of the OSHA Act, the terms of its contract with the Government, and DoD-required protocols, Lockheed Martin forced employees to work in hazardous conditions and failed to provide sufficient respirators and protective gear.

96.      Lockheed's practices also did not conform to the manufacturer's approved methods, which state that employees should be provided with suitable personal protective equipment (PPE). The SDS for the promoter states, "Respirator selection must be based on known or anticipated exposure levels, the hazards of the product and the safe working limits of the selected respirator. If workers are exposed to concentrations **above the exposure limit**, they must use appropriate, certified respirators. **Use a properly fitted, air-purifying or air-fed respirator complying with an approved standard if a risk assessment indicates this is necessary**." Exhibit 5 at 9 (emphasis added).

97.      Lockheed should not have instructed its employees to use the promoter inside at all, but to make matters worse, Lockheed only provided Relator and his coworkers with N-95 masks, and/or 3M full or half face masks with disposable air cartridges, which were woefully inadequate, as they were ill-fitting and only filtered air through a few layers of fabric or cotton-based batting. Lockheed should have given Relator and his coworkers a more complex respirator, in which fresh air is delivered from a tank of compressed air to the interior of a mask that covers the entire face. Furthermore, Lockheed only gave Relator and his coworkers light coveralls unless there were going to be visitors in the building. If an OSHA inspector or other visitors were coming

on site, Lockheed gave its employees Tyvek suits.  Even the Tyvek suits were inadequate, as they were easily torn by the sharp edges of the metal inside the aircraft wing, leaving bare skin exposed to the toluene in the adhesion promoter.

98.     Relator and other employees were spraying the promoter inside the aircraft's wing where air circulation barely exists. When spraying this chemical on the plane, employees both spraying the plane and in other parts of the facility were inhaling what amounts to industrial strength airplane glue. Applying the chemical using this method will have long-term consequences for Relator and his coworkers.

99.     Notably, since he began sealing the C-130J aircraft, Relator has had the following medical diagnoses related to applying the adhesion promoter using an improper method:

- o   Early stages of liver cirrhosis

- o   Hemochromatosis (iron overload in the blood)

- o   Type-2 diabetes

- o   Nasal cyst/tumor—surgery performed in April 2017

- o   Chronic pain requiring two shoulder surgeries

- o   Chronic headaches

- o   Hearing loss—right ear

- o   Vision loss—both eyes

- o   Chronic hepatitis B infection

- o   Mild neurocognitive disorder

Relator's medical records support a direct linkage between his exposure to the chemicals in the PR-148 adhesion promoter and these medical conditions, particularly his hemochromatosis,

chronic headaches, and chronic pain, with all contributing to a significant reduction in his quality of life.

100.    Other members of Relator's crew also suffered devastating health consequences, such as loss of the sense of smell. Relator complained to Mr. Crump about the fumes making the crew sick and began asking Crump and other members of Lockheed Martin management about the company's deviation from Lockheed Martin's own Manufacturing Process Standard.  Relator was given various unresponsive answers.

101.    On one occasion, Relator was told by a supervisor that he misunderstood the Manufacturing Process Standard and that a paint spray gun was an acceptable method of applying adhesion promoter. On another occasion, Relator was told by Earl Pinkett, Lockheed's Environment, Safety, and Health (ESH) Manager, that Lockheed uses PPG's PR-142 adhesion promoter, not PR-148 adhesion promoter, and that PR-142 is the type of promoter that can be applied using a paint spray gun.  Relator then checked the label on a bottle of adhesion promoter that was being used with the paint spray guns. The label identified the product as ***PR-148***. Relator's supervisor had told him the incorrect type of PPG adhesion promoter, PR-142.  PR-142 was not used for the manufacturing of a C-130J but used in the field to repair C-130Js.

102.    Relator also began questioning Lockheed Martin's practice of leaving adhesion promoter on the aircraft, uncovered, for more than eight hours before applying sealant to the fuel tanks.  This is a clear violation of the Manufacturing Process Standard that prohibits the application of sealant if adhesion promoter has been left unprotected on a fuel tank for more than eight hours. Relator was either disregarded or given a nonsensical explanation for Lockheed Martin's conduct, and the practice continued.

### C.     Lockheed Martin Concealed its Unsafe Working Conditions From OSHA

103.    Frustrated by Lockheed Martin's lack of action, Relator and other employees contacted OSHA in 2016 and complained that employees were being overexposed to fumes while spraying PR-148 adhesion promoter and that it was making employees sick. OSHA received a report that on August 30, 2016, a Lockheed employee was standing on top of a C-130J wing when his eyes rolled back in his head, and he appeared to lose consciousness. Another employee witnessed him fall approximately two feet from the wing stand, resulting in injuries to the employee's face and throat that required surgery. Relator also submitted a complaint to OSHA about the fumes on October 31, 2016, which was assigned case number 1121899. *See* exhibit 10 (November 3, 2016 e-mail from OSHA to Relator).

104.    Relator was told that OSHA would conduct an air quality test in response to his complaint. As part of the test, the OSHA inspectors placed a sensor outside the C-130J wings to monitor the fumes released when applying the promoter inside the wings. Approximately two days before the OSHA test, however, Lockheed management changed the spray gun's application characteristics by changing the spray gun nozzle aperture to a larger size. They also reduced the paint gun air pressure, causing the spray gun to become a high volume-low pressure (HVLP) apparatus.  The result of this change was a dramatic reduction in the atomization of PR-148. Through a combination of aperture enlargement and lower air pressure, when the PR-148 was applied during the OSHA test, less toluene was available to impregnate the surrounding air.

105.    In other words, Lockheed concealed the environmentally unsafe practice it continued to engage in for the purpose of misleading OSHA and manipulating the inspection results.

106.     The OSHA inspectors removed the sensor after the air quality testing, and a few days later, Lockheed management changed the spray gun nozzle apertures back to the original sizes, which used less of the promotor but aerosolized much more of the chemical in the work area, resulting in more of the product being ingested by the employees. They also increased the air pressure of the spray gun.

107.     Lockheed utilized a clever parlor game of "bait and switch" to convince OSHA that the air quality was safe when it was not. As soon as OSHA completed its inspection, Lockheed reverted to its business model of placing profit ahead of the safety of its employees.

**D.     Lockheed Martin's Knowing and Reckless Disregard of the Manufacturing and Environmental Standards for Sealing Integral Fuel Tanks**

108.     From at least 2010 until the present, Lockheed Martin has not adhered to its own Manufacturing Process Standard for sealing integral fuel tanks as required by FAR and Lockheed Martin's contracts with the Government. Lockheed Martin uses a prohibited method of applying adhesion promoter—a paint spray gun—and applies sealant after the adhesion promoter has been on the fuel tanks well past the eight-hour maximum time limit allowed by the Manufacturing Process Standard.

109.     Specifically, after the integral fuel tanks are cleaned and prepared for the adhesion promoter, Lockheed Martin does not use any of three manufacturer-approved methods for applying the promoter—aerosol spray can, soft bristle brush using a pint-size bottle, or a clean cloth saturated with adhesion promoter. Instead, the adhesion promoter is applied to the integral fuel tanks with a paint spray gun, exposing employees and the environment to unnecessary hazards. As noted *supra*, in 2010, Lockheed Martin employees were instructed to use this method by their supervisor, David Crump, to reduce the amount of time needed to complete the sealing process for the integral fuel tanks on a C-130J.

38

110.    The paint spray gun method for applying adhesion promoter is messy and imprecise and causes substantial overspray onto other parts of the fuel tanks. Applying promoter to parts that do not require sealant is prohibited by the Manufacturing Process Standard, as is use of the spray gun apparatus itself. *See* Exhibit 1 (Manufacturing Process Standard); *see also* exhibit 7 (Photographs of "stop work" tags, noting that use of paint spray guns was out of compliance with the Manufacturing Process Standard for sealing C-130 integral fuel tanks).

111.    This application method also deprives the Government of the service it contracted for, which is the careful construction of its aircraft utilizing an approved method as opposed to the haphazard use of a paint spray gun.

 

**Images 13 and 14: Overspray in the internal parts of the wing skins caused by use of paint spray gun to apply adhesion promoter**

112.    Furthermore, after the adhesion promoter was incorrectly applied using the paint spray gun method, Lockheed Martin frequently left the promoter exposed and unprotected on the fuel tanks for more than eight hours without applying sealant. For example, Lockheed's integral fuel tank team took a month-long break in December 2017 and January 2018. During that time,

Lockheed Martin allowed adhesion promoter to stay exposed on a fuel tank for almost a month. *See* Exhibit 6 (Lockheed Martin Shop Floor Management Activity Record, reflecting the 26-day gap between the application of adhesion promoter and sealant). The promoter was applied on December 19, 2017, and the sealing process was completed on January 25, 2018, meaning that the promoter was on the aircraft for 26 days before sealant was applied instead of the maximum eight hours. *Id.*

### E.    Examples of Mechanical Problems Due to Improper Sealing of Fuel Tanks

113.    Relator obtained Air Force maintenance logs concerning leaks associated with the C-130J aircraft's fuel cells. Attached as exhibits 12 and 13 are two Air Force maintenance logs containing a total of 836 line items detailing leaks in approximately eighty (80) different C-130J aircraft since January 2010. Relator reviewed these logs and determined that 290 of the 836 line items were specifically related to leaking fuel cells which were improperly sealed, which equates to roughly 35% of the total line items on the spreadsheets. *See* exhibits 14 and 15 (C-130J maintenance logs with markings by Relator to indicate line items where the leak appears to be due to improper sealing of the fuel tank).

### F.    Lockheed's Shortcut Cheated the Government

114.    As previously noted, there are only three contractually approved methods of applying promoter: 1) aerosol can, 2) soft bristle brush, or 3) clean cloth. Lockheed bid the contract based on using this required methodology, and the Air Force awarded the contracts based on same.

115.    The application of adhesion promotor is a time-consuming process, and Relator estimates that it took eighty (80) hours per fuel cell when performing the work properly. While it did take longer to apply the adhesion promoter using one of the approved methods, its careful

application was necessary to ensure the efficacy of the promoter and the safety of the worker applying it.

116.    It would have been permissible for Lockheed to attempt to change the methodology for application of the adhesive promotor had it requested a variance and had the Air Force granted one. Before the Air Force could grant such a variance, however, Lockheed's new process of spraying fuel cells with a paint spray gun would have to be proven both effective and safe, which it could never be. But Lockheed never sought a variance, nor could the Air Force ever honestly grant one.

117.    Instead, Lockheed decided to implement the use of high-pressure spray equipment to apply the promoter without the Government's knowledge or approval, and it made this decision in the interest of profitability.

118.    Lockheed was able to bank the reduced application time as pure profit in the firm fixed price contracts. Lockheed bid the contract as if it took dozens of hours to apply the promoter, which it may take if done correctly. Spraying fuel cells with a spray gun, however, takes an average of one hour, meaning that Lockheed made a huge profit based on reduced labor.

119.    Lockheed did not seek a variance for two important reasons: 1) it knew the application method would never pass the OSHA safety regulations governing such application, and 2) it knew the Air Force would rescope the labor costs of the contract, thus greatly reducing its profits.[9]

---

[9] "Rescoping" means the contract requirements have changed from what was initially contracted for, in this case labor. A dramatic reduction in labor costs would cause the Air Force to reduce its contract cost correspondingly through reduction of the payment of inflated labor costs to Lockheed.  Rescoping has the effect of ensuring a reasonable profit for the prime contractor while protecting the Government from costly overpayments.

## XI.   LOCKHEED MARTIN RETALIATED AGAINST RELATOR

120.    In 2010, Relator's supervisor, David Crump, instructed the tank sealing crew to use paint spray guns to apply adhesion promoter inside the wings of C-130J aircraft. Relator confronted him about this practice in late 2010 and told Mr. Crump that the fumes from spraying the promoter were giving him headaches and making everyone sick. Mr. Crump had a sensor installed in the tank sealing work area which would alert the crew when PR-148 was being sprayed, but the practice of spraying the promoter, as opposed to using an approved method of application, went unchanged.

121.    Over the next few years, Relator repeatedly told Lockheed management that applying adhesion promoter using a paint spray gun was unsafe and making the crew sick. Specifically, Relator had contact with the following individuals in addition to Mr. Crump: Joe Letourneai (supervisor), Ralph Fontana (supervisor), Rick Cochran (manager), John Rhodes (manager), Earl Pinkett (ESH manager), and Mike Roach (employment training manager). Even though Lockheed had a medical clinic on site, and even though Lockheed personnel were aware that Relator was working in a hazardous environment, Relator was not told to seek medical testing or treatment at Lockheed's clinic.

122.    Relator's health worsened, and he sought medical treatment in September 2015. Relator's blood work showed liver enzymes so high that the doctor asked about his alcohol consumption. When Relator told his doctor that he does not consume alcohol, they discussed whether the chemicals in the adhesion promoter could be the cause of his health problems. Relator subsequently sought additional treatment at Lockheed's clinic, and his blood work from that visit confirmed his elevated liver enzymes.

123.    Relator reviewed the Material Safety Data Sheet (MSDS) for the promoter and confirmed that the chemicals in PR-148 may cause damage to the liver and nervous system, as

well as other medical problems. He also confirmed that the method of using a paint spray gun to apply promoter went against the manufacturer's instructions for using the product and the Manufacturing Process Standard.

124.    Relator continued to try to convince Lockheed to cease the practice of forcing employees to apply adhesion promoter with a paint spray gun rather than using the approved method specified in the MSDS. To that end, he contacted his Union in 2016 and filed a complaint. Relator spoke with the Union President, Johnny Stevens, directly about his concerns of air quality within his workspace.

125.    Mr. Stevens sent the Union Vice President, Mike Owens, to Lockheed to address the complaints from Relator and other employees regarding the noxious fumes. Mr. Owens determined that there was a large volume of fumes emanating in the work area. He was successful in getting Lockheed management to agree to reduce the air pressure for the spray guns, but only for some of the shifts. Lockheed never reduced the air pressure, however, and Relator continued to be exposed to a high level of fumes.

126.    Relator's health continued to decline, and he continued to complain about the fumes and use of an unapproved method to no avail. Rather than stopping this practice, Lockheed retaliated against Relator by forcing him to continue to endure hazardous conditions, thus exacerbating the medical problems caused by Lockheed's use of an unapproved and hazardous method of applying adhesion promoter.

127.    In March 2018, Relator filed this case in an effort to stop Lockheed from continuing to utilize its unsafe and unapproved practice. On July 17, 2018, DoD personnel inspected the Lockheed Martin facility and caused the paint spray guns to be tagged as out of compliance with the Manufacturing Process Standard for sealing C-130 integral fuel tanks. *See* Exhibit 7

(Photographs of "stop work" tags, noting that use of paint spray guns was out of compliance with the Manufacturing Process Standard for sealing C-130 integral fuel tanks).

128.    Immediately after the DoD inspection, Relator's supervisor began treating him differently. He was reassigned to work in Building 28, where he was told to work on some broken shelves. Relator's job responsibilities were essentially scaled down to menial labor.

129.    Furthermore, the conditions in Building 28 were in some ways worse than where he had previously worked. Notably, Building 28 did not have any air conditioning, and the temperature was consistently between 85 and 98 degrees. The bathrooms were dilapidated, dirty, and cluttered with boxes and chemical bottles, as shown below:

 



**Images 15, 16, and 17: Building 28 Bathrooms**

130.    Similarly, the kitchen that Relator used to store his lunch and get water during

breaks was rusty, moldy, and in general, dirty:

 

**Images 18 and 19: Building 28 Kitchen**

131.     Relator was forced to work in these disgusting conditions and was unable to quit working for Lockheed, because he had a family to support.

132.     In addition to the menial labor of fixing shelves, Lockheed also assigned Relator to work at Lockheed's security gate checking cars as they entered the facility, a far cry from the skilled labor he had previously performed as a mechanic.

133.     After four months of being exiled to Building 28, Lockheed Martin terminated Relator on November 5, 2018, two weeks after he was interviewed by the Government (on October 22, 2018) in connection with the allegations herein. The letter Lockheed sent to Relator informing him of his termination stated that he was "out" due to his medical limitations and the company's inability to accommodate them. *See* exhibit 11 (November 5, 2018 letter from Lockheed Martin terminating Relator's employment). Relator's medical limitations were caused by Lockheed's misconduct, and now, ironically, Lockheed claimed it was terminating him due to those limitations.

134.     In May 2021, more than two-and-a-half years after terminating him, Lockheed sent Relator a letter notifying him that his "request for time away from work has been approved" and that he had been granted a medical leave of absence from November 6, 2018 through September 30, 2021. *See* exhibit 16 (May 6, 2021 letter from Lockheed Martin Leave and Disability Center, Sedgwick Claims Management Services, to Relator approving medical leave of absence). When Relator contacted Lockheed to ask why the letter had been sent, Relator was told it was in response to his (Relator's) request for a medical leave of absence. Relator told the individual that he had been terminated in November 2018 and had never submitted a request for medical leave of absence.

135.    Lockheed then contacted Relator in September 2021 and told him to request an extension of the "medical leave," which was set to expire at the end of that month. Relator did not request an extension of the medical leave, which he had never requested in the first place. Lockheed was belatedly trying to cover up its retaliatory termination of Relator's employment by calling it a "medical leave of absence" effective November 6, 2018, even though Lockheed sent Relator a termination letter on November 5, 2018.

136.    Lockheed's "Ethics Office" also sent Relator a postcard in November 2021 advising him that he could "contact [his] local Ethics Officer" or Lockheed Martin's compliance hotline should he be "concerned about possible policy violations or misconduct." *See* exhibit 17 (Postcard from Lockheed's Ethics Office).

137.    Since the time of his termination in November 2018, Relator has had to take approximately $137,000 from his 401K to pay for his family's living expenses. He lost his health insurance coverage when Lockheed terminated him, and he was unable to get any insurance coverage for several months. In early 2019, Relator was able to enroll in a plan offered through the Affordable Care Act, but the plan does not cover his specialists or provide for his complex medical needs—it is essentially catastrophic coverage.

138.    Because he no longer receives health insurance through Lockheed, Relator has been unable to receive regular health testing and medications needed to treat his conditions. His health continues to deteriorate, and his quality of life has suffered. Relator is still unable to find employment, and his medical expenses continue to pile up. Lockheed Martin's retaliation against Relator has caused him significant financial, emotional, and physical harm.

## XII.   ACTIONABLE CONDUCT

**A.   False Claims Act**

**1.   Applicable Law**

139.   This is an action to recover damages and civil penalties on behalf of the Government and Relator arising from false and/or fraudulent statements, claims, and acts by Lockheed made in violation of the False Claims Act, 31 U.S.C. §§ 3729–32.

140.   The FCA provides that any person who

> (A)   knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B)   knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim

is liable to the Government for a civil penalty for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim.  *See* 31 U.S.C. § 3729(a)(1).

141.   The FCA defines "claim" as:

> (A)   [] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—
>
> (i)   is presented to an officer, employee, or agent of the United States; or
>
> (ii)   is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
>
> (I)   provides or has provided any portion of the money or property requested or demanded; or
>
> (II)   will reimburse such contractor, grantee, or other recipient for any portion of the       money or property which is requested or demanded. . . .

31 U.S.C. §3729(b)(2).

142.     The FCA allows any person having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for himself and for the United States and to share in any recovery as authorized by 31 U.S.C. § 3730. The FCA also protects an individual who has suffered retaliation because of his or her efforts to stop violations of the False Claims Act. *See* 31 U.S.C. § 3730(h).

143.     Further, the FCA protects employees, contractors, and agents who engage in protected activity from retaliation in the form of their being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment." *See* 31 U.S.C. § 3730(h)(1).

144.     Based on these provisions, Relator, on behalf of the United States and on his own behalf, seeks through this action to recover damages and civil penalties arising from Defendant's violations of the False Claims Act.

### 2.     Defendant's Violations of the False Claims Act

### a.     Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))

145.     From at least 2010 to the present, Lockheed has knowingly presented false and/or fraudulent claims for payment or approval to the United States.  As a condition of entering into a contract with the United States, Lockheed agreed to comply with FAR, the OSHA Act, the Clean Air Act, as well as the requirements within the contract. Relevant here, Lockheed agreed to manufacture C-130J aircraft in compliance with its contracts with the Government, including, FA8504-06-D-0001, FA8504-16-D-0001, FA8504-17-F-0047, FA8625-11-C-6597, FA8625-14-C-6450, and FA8625-16-D-6458. Each contract incorporates and requires adherence to Lockheed's Manufacturing Process Standard for sealing C-130J integral fuel tanks, as well as

regulations prohibiting employers from exposing employees to hazardous conditions without sufficient protective gear.

146.    Each time Lockheed invoiced the Government, it certified that it not only complied with FAR, the OSHA Act, and environmental regulations, but also the manufacturing specifications in the contracts. These representations were false, and Lockheed knowingly made numerous express false certifications of compliance with regulations and contract terms; in reality, Lockheed complied with neither the regulations nor the contracts. Also, the aircrafts were defective, because they were not manufactured in accordance with the Manufacturing Process Standard. Likewise, Lockheed knowingly made material implied false certifications of compliance when it delivered defective aircraft knowing that the Government was not aware of the defects.

147.    If the Government had known that the integral fuel tanks on the C-130J aircraft were defective, the Government would not have paid Lockheed for the aircraft.  By concealing the defective integral fuel tanks, Lockheed deprived the Government of its contractual and regulatory right to reject or require correction of the nonconforming aircraft or to terminate the contract.

148.    Furthermore, Lockheed bid the contract as if it required dozens more hours to apply the promoter than it took. In reality, Lockheed's grossly truncated method of spraying promoter considerably reduced the number of labor hours required for each fuel cell. Lockheed never informed the Government of its changed methodology and did not receive approval for same. Had the Government been aware that Lockheed was overcharging the Government for labor, it would not have paid the claims.

149.    Defendant's regulatory and contractual violations were material, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for goods and services provided in compliance with FAR. Had the United

States known of Defendant's failure to comply with the contracts' specifications, as well as Defendant's regulatory violations, the United States would not have paid the claims.

150.     By virtue of Defendant's actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### b.     Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))

151.     From at least 2010 to the present, Defendant knowingly made or used false records or statements material to false or fraudulent claims paid or approved by the United States. These false statements or records include Defendant's false certifications or representations of compliance with all laws in requesting payments from the Government for performing the contracts at issue in this case. Defendant falsely certified, expressly and impliedly, that its statements were true, accurate, and correct.

152.     In 2006, Lockheed was awarded its first contract for the refurbishment of existing C-130Js by the DoD pursuant to contract no. FA8504-06-D-0001. Thereafter, the Government on numerous occasions modified and extended its contract with Lockheed.  Prior to each contract modification, Lockheed represented that it would comply with FAR, including the requirement that any product manufactured by Lockheed comply with the terms of the applicable contract for the product, and that it would implement an effective quality control system.

153.     Lockheed represented that it would manufacture C-130J aircraft in compliance with the contracts, including contract nos. FA8504-06-D-0001, FA8504-16-D-0001, FA8504-17-F-0047, FA8625-11-C-6597, FA8625-14-C-6450, and FA8625-16-D-6458. Each contract incorporates and requires adherence to Lockheed's Manufacturing Process Standard for sealing C-130J integral fuel tanks, as well as the OSHA Act and environmental regulations. Lockheed knowingly made false representations material to the Government's decisions to modify and

extend the contracts.

154.    If the Government had known that the integral fuel tanks on the C-130J aircraft were not, or would not be, manufactured in accordance with the Manufacturing Process Standard for sealing the tanks, the Government would not have accepted the aircraft and paid Lockheed, and it may also have refused to modify and extend the original contract.

155.    Furthermore, Lockheed bid the contract as if it required dozens more hours to apply the promoter than it actually took. In reality, Lockheed's grossly truncated method of applying promoter considerably reduced the number of labor hours required for each fuel cell. Lockheed never informed the Government of its changed methodology and did not receive approval for same. Had the Government been aware that Lockheed was overcharging the Government for labor, it would not have paid the claims.

156.    Defendant's express and implied false certifications of compliance with FAR and environmental statutes and regulations were material, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for goods and services provided in compliance with FAR and other regulations. Had the United States known of Defendant's slipshod and dangerous manufacturing process, it would not have paid the claims.

157.    Given the structure of the Government contracting system, the false statements, false representations, false records, and/or material omissions made by the Defendant were capable of influencing the payment decisions of the Government. Lockheed's fraudulent representations earned it millions of dollars to which it was not legitimately entitled. The ultimate submission to the Government of false claims for payment was a cause in the Government's loss and a consequence of the scheme.

158.    By virtue of Defendant's actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**B.      Defendant's Retaliation Against Relator**

159.    Section 3730(h) of Title 31 of the U.S. Code defines whistleblower protection under the FCA as follows:

(1)    Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of efforts to stop 1 or more violations of this subchapter. . . .

(2)    Relief … shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

160.    Lockheed retaliated against Relator because of his efforts to stop it from defrauding the Government in violation of the False Claims Act by delivering an unsafe product manufactured in dangerous conditions and exposing its employees to health and safety violations. Lockheed altered the manufacturing process the contracts called for by using paint spray guns, which exposed Relator and his coworkers to noxious fumes that caused multiple health problems.

161.    Lockheed's final act of retaliation was to terminate Relator, which stripped him of his health insurance. Relator has been unable to obtain other employment due to his medical conditions, and his health is deteriorating as a direct result of his inability to afford proper medical care for the following conditions:

o   Liver cirrhosis

- o  Hemochromatosis (iron overload in the blood)

- o  Type-2 diabetes

- o  Nasal cyst/tumor

- o  Chronic headaches

- o  Chronic pain requiring two shoulder surgeries

- o  Hearing loss—right ear

- o  Vision loss—both eyes

- o  Chronic hepatitis B infection

- o  Mild neurocognitive disorder

162.   Relator has suffered economic loss and sustained special damages, including expenses associated with his medical conditions, which are worsening because of Defendant's retaliatory acts, and he is entitled to relief pursuant to 31 U.S.C. § 3730(h).

## XI.   CAUSES OF ACTION

### A.   Count I – Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))

163.   Relator realleges and incorporates by reference each and every allegation contained in all paragraphs of this Fifth Amended Complaint.

164.   From 2010 to the present, Defendant has knowingly presented false or fraudulent claims for payment to the Government for work performed on contract nos. FA8504-06-D-0001, FA8504-16-D-0001, FA8504-17-F-0047, FA8625-11-C-6597, FA8625-14-C-6450, and FA8625-16-D-6458.

165.   Lockheed knowingly violated FAR, which requires it to manufacture the C-130J aircraft in accordance with the processes in Lockheed's contracts with the Government. Lockheed also knowingly subjected its employees to hazardous conditions and failed to provide appropriate protective gear, in violation of the OSHA Act. Lockheed also harmed air quality and the health of

its employees by using an unapproved method to apply PR-148. Furthermore, Lockheed misled the Government on the amount of labor required to manufacture each fuel cell and grossly overcharged the Government.

166.    Pursuant to 48 C.F.R. § 32.905(a), the basis for payment is on receipt of a proper invoice and satisfactory contract performance. Defendant caused the United States to make payments for goods and services that it would not have made had it known the contractor was manipulating inspection results.

167.    Defendant's violations of the OSHA Act, FAR, environmental regulations, and other terms of the contracts were material, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for goods and services provided in compliance with federal regulations and the terms of the contracts. Had the United States known of Defendant's failure to comply with contract terms, FAR, and other regulations, the United States would not have paid the claims.

168.    The United States paid the false or fraudulent claims.

169.    By virtue of Defendant's actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**B.    Count II – False Records or Statements (31 U.S.C. § 3729(a)(1)(B))**

170.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Fifth Amended Complaint.

171.    Lockheed made and/or used false records and/or statements that were material to the false and/or fraudulent claims paid or approved by the Government and induced the Government into modifying and extending its contracts. Lockheed's false statements and/or records include, but are not limited to, representations that it (1) would comply with the FAR requirement that it adhere to the manufacturing standards in the contracts; (2) would comply with

the FAR requirement that it implement a quality assurance system to prevent the manufacturing of defective products; (3) would manufacture C-130J aircraft in compliance with its contracts with the Government; and (4) required dozens of hours of labor per fuel cell when it actually required much less than that.

172.    Defendant's express and implied false certifications of compliance with FAR, the OSHA Act, and the Clean Air Act were material, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for goods and services provided in compliance with contract terms and federal regulations. Had the United States known of Defendant's failure to comply with contract terms, FAR, and other regulations, the United States would not have paid the claims.

173.    Given the structure of the Government contracting system, the false statements, false representations, false records, and/or material omissions made by the Defendant were capable of influencing the payment decisions of the Government. Due to its fraudulent representations, Defendant earned millions of dollars to which it was not legitimately entitled. The ultimate submission to the Government of false claims for payment was a causative factor in the Government's loss and a consequence of the scheme.

174.    By virtue of Defendant's actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## PRAYER FOR RELIEF

175.    WHEREFORE, Relator respectfully requests that the Court enter judgment against the Defendant and award the following:

   (1)    Damages in the amount of three (3) times the actual damages suffered by the United States as a result of Defendant's conduct;

(2) Civil penalties against Defendant up to the maximum allowed by law for each violation of 31 U.S.C. § 3729;

(3) The maximum award Relator may recover pursuant to 31 U.S.C. § 3730(d);

(4) All costs and expenses of this litigation, including attorney's fees and costs of court; and

(5) All other relief on behalf of Relator or the United States that the Court deems just and proper.

## C.   Count III – Retaliation (31 U.S.C. § 3730(h))

176.   Relator realleges and incorporates by reference each and every allegation contained in all paragraphs of this Fifth Amended Complaint.

177.   In violation of 31 U.S.C. § 3730(h), Defendant retaliated against Relator because of lawful acts he conducted in furtherance of efforts to stop Defendant from committing violations of the False Claims Act.

178.   Relator has suffered economic loss and special damages because of Defendant's retaliatory acts. He has been unable to find any employment and cannot afford the health insurance he was receiving before Defendant supposedly fired him for, ironically, his worsening medical conditions. Relator's medical conditions were caused by Lockheed's use of an unsafe and prohibited manufacturing method, in violation of its contracts with the United States.

### PRAYER FOR RELIEF

179.   Relator prays that the Court enter judgment against Defendant for the following:

(1) Two times the amount of Relator's back pay;

(2) Interest on Relator's back pay;

(3) Compensation for special damages sustained by Relator as a result of Defendant's actions, including costs associated with his worsening medical conditions;

(4)     Litigation costs and attorney's fees; and

(5)     Any other relief the Court deems just and proper to make the Relator whole.

## XII.   DEMAND FOR JURY TRIAL

180.    Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

## XIII.   EXHIBIT INDEX

181.    The following documentary evidence is referenced herein:

| No. | Document Description | Bates Number |
|---|---|---|
| 1 | Lockheed Martin Aeronautics Company Manufacturing Process Standard Sealing C-130 Integral Fuel tanks | ISSAC0000001-ISSAC0000050 |
| 2 | Technical Data PR-148 Adhesion Promoter | ISSAC0000051-ISSAC0000053 |
| 3 | Relator's Official Lockheed Martin Job History & Employee ID Card | ISSAC0000054-ISSAC0000058 |
| 4 | Specifications for the BINKS Model 80-600 SG-2 PLUS Paint Spray Gun | ISSAC0000059-ISSAC0000067 |
| 5 | Safety Data Sheet for PR-148 Adhesion Promoter | ISSAC0000068-ISSAC0000088 |
| 6 | Lockheed Martin Shop Floor Management Activity Record, reflecting the 26-day gap between the application of adhesion promoter and sealant | ISSAC0000089-ISSAC0000094 |
| 7 | Photographs of "stop work" tags, noting that use of paint spray guns was out of compliance with the Manufacturing Process Standard for sealing C-130 integral fuel tanks | ISSAC0000095-ISSAC0000098 |
| 8 | Photographs of Building 28 Bathrooms | ISSAC0000099-ISSAC0000101 |
| 9 | Photographs of Building 28 Lunchroom | ISSAC0000102-ISSAC0000103 |
| 10 | November 3, 2016 e-mail from OSHA to Relator | ISSAC0000104-ISSAC0000105 |
| 11 | November 5, 2018 letter from Lockheed Martin to Relator terminating Relator's employment | ISSAC0000106 |
| 12 | Air Force C-130J maintenance log containing 17 pages | ISSAC0000107-ISSAC0000123 |
| 13 | Air Force C-130J maintenance log containing 6 pages | ISSAC0000124-ISSAC0000129 |
| 14 | Air Force C-130J maintenance log containing 17 pages with markings by Relator | ISSAC0000130-ISSAC0000146 |

| 15 | Air Force C-130J maintenance log containing 6 pages with markings by Relator | ISSAC0000147-ISSAC0000152 |
|----|------------------------------------------------------------------------------|---------------------------|
| 16 | May 6, 2021 letter from Lockheed Martin Leave and Disability Center, Sedgwick Claims Management Services, to Relator approving medical leave of absence | ISSAC0000153-ISSAC0000154 |
| 17 | Postcard from Lockheed's Ethics Office | ISSAC0000155-ISSAC0000156 |
| 18 | DoD Test Method Standard, publication MIL-STD-1916 | ISSAC0000157-ISSAC0000189 |

Respectfully submitted,

BRUNE LAW FIRM


  S/KENNETH L. BRUNE
BRUNE LAW FIRM
Kenneth L. Brune
OK State Bar No. 1249
900 Reunion Center
Nine East Fourth St.
Tulsa, Oklahoma 74103
Telephone (918) 599-8600
Facsimile (918) 599-8673

-AND-

BERG & ANDROPHY

Joel M. Androphy (*pro hac vice*)
TX State Bar No. 01254700
Janis G. Gorton (*pro hac vice*)
TX State Bar No. 24071063
3704 Travis Street
Houston, Texas 77002
Telephone (713) 529-5622
Facsimile (713) 529-3785


ATTORNEYS IN CHARGE FOR RELATOR
TESFALEM ISSAC

**CERTIFICATE OF SERVICE**

I hereby certify that on February 21, 2022, I caused a true and correct copy of this Fifth Amended Complaint to be served on the United States Department of Justice and the United States Attorney's Office in the Northern District of Oklahoma via certified mail, return receipt requested.

I further certify that on February 21, 2022, I caused a true and correct copy of this Fifth Amended Complaint to be sent via electronic mail to Merrick Garland, United States Attorney General, at Civilfrauds.quitams@usdoj.gov.

I hereby certify that on February 21, 2022, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Marianne S. Hardcastle
marianne.hardcastle@usdoj.gov

Kristin F. Harrington
kristin.harrington@usdoj.gov

Joy P. Thorp
joy.thorp@usdoj.gov

Joseph Harper
joe.harper@dinsmore.com

Lauren Weiner
lauren.weiner@dinsmore.com

Adam Doverspike
adoverspike@gablelaw.com

_/S/ KENNETH L. BRUNE_____
Kenneth L. Brune

I